IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL GOLD and MELODY
GOLD,

     Plaintiffs,

v.

OCWEN LOAN SERVICING, LLC,
and EQUIFAX INFORMATION
SERVICES, LLC,

     Defendants.

CIVIL ACTION NO.
1:14-CV-1774-MHC-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This case is presently before the Court on Defendant Ocwen Loan Servicing, LLC's ("Ocwen") Motion for Summary Judgment. (Doc. 57). For the reasons explained below, Ocwen's Motion for Summary Judgment should be **GRANTED IN PART AND DENIED IN PART**. (Doc. 57).

## OCWEN'S MOTION FOR SUMMARY JUDGMENT

This lawsuit represents the consolidation of two cases filed against Ocwen for claims arising out of Ocwen's servicing of Michael Gold's mortgage loan. In the first lawsuit, filed on August 30, 2012, Plaintiffs Michael and Melody Gold (either "the Golds" or "Plaintiffs") amended their Complaint on September 24, 2013, and claimed therein that Ocwen violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"), breached their loan agreement, and should be compelled to

appoint an auditor to provide an accounting of their loan.  See Gold, et al., v. Ocwen Loan Servicing LLC, No. 1:12-CV-3056-MHC, Doc. 24  (N.D. Ga. Sept. 23, 2013). Specifically, Plaintiffs contend that Ocwen did not timely respond to qualified written requests they sent to Ocwen in August 2011, October 2011, and March 2012.  (Sept. 24, 2013 Am. Compl., hereinafter "Am. Compl.," ¶¶ 14, 15, 17-20, 22, 30-33, 44, 59-61). Plaintiffs further contend that Ocwen breached a Modification Agreement of their loan because Ocwen refused to accept their mortgage payments via phone or U.S. mail, locked them out of accessing their account on the internet, and forced them to mail their payments via certified mail at least thirty days in advance of the due date.  (Am. Compl. ¶ 66).  Plaintiffs contend that they are entitled to an accounting prepared by an auditor because Ocwen never provided them with a proper accounting of their loan payments, failed to properly apply their payments, and charged improper late fees and a higher interest rate than agreed to in the Modification Agreement.  (Am. Compl. ¶ 68-70).

Plaintiff Michael Gold filed a second lawsuit on June 6, 2014, this time alleging Ocwen and Equifax Information Services, Inc.[1] violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA").  See Michael Gold v. Ocwen Loan Servicing, LLC et al., No. 1:14-CV-1774-MHC, Doc. 1 (N.D. Ga. June 6, 2014).  Specifically, Michael Gold alleged that Ocwen violated the FCRA of when it willfully and/or negligently failed to report Mr. Gold's account as disputed and furnished false credit information

---

[1]  Michael Gold also brought claims against Trans Union, LLC and Experian Information Solutions, Inc., but subsequently dismissed them.  (Docs. 36, 54).

to third parties without conducting a reasonable investigation into Plaintiff's dispute.

Ocwen argues summary judgment should be granted as to (1) Plaintiffs' RESPA claims because the letters sent to Ocwen were not qualified written requests, Ocwen properly and timely responded to the letters, and Plaintiffs do not show that they suffered damages caused by Ocwen's alleged RESPA violations; (2) Plaintiff Melody Gold's RESPA claims because RESPA only protects borrowers and she was not a borrower on Mr. Gold's loan; (3) Plaintiff Michael Gold's FCRA claims because Ocwen's reporting was accurate, Ocwen's investigation was reasonable in light of the information Michael Gold provided, Michael Gold raised no bona fide or meritorious dispute triggering the obligation to report his account as disputed; and (4) Plaintiff Melody Gold's breach of contract claim because she does not have standing to challenge a breach of the Note or Modification Agreement.  Ocwen also argues in a perfunctory manner that Plaintiff Michael Gold has not provided evidence to support the elements of his breach of contract claim and "has failed to present evidence to demonstrate that an auditor should be appointed under Georgia law."

## **FACTUAL BACKGROUND**[2]

---

[2] All facts taken directly from the Ocwen's Statement of Undisputed Material Facts (hereinafter "DSMF") remain undisputed.  This Court must accept as admitted those facts in the moving party's statement that have not been specifically controverted with citation to the relevant portions of the record by the opposing party. LR 56.1B(2), (3), NDGa.   Subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact in order to withstand summary judgment. See Chapman v. AI Transp., 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc); Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); Carter v. City of Miami, 870 F.2d 578, 585

Plaintiffs Michael and Melody Gold own a home located on Elm Creek Road in Marietta, Georgia ("the Property"). (DSMF ¶ 1). In December 2006, Michael Gold refinanced the loan for the home and signed a promissory note and security deed for the new loan. (DSMF ¶ 2). Melody Gold did not join Michael Gold in taking out the loan so she did not sign the promissory note. (DSMF ¶ 2). Melody Gold did sign the Security Deed so that Mr. Gold's loan was secured by the Property. (DSMF ¶ 3). Mr. Gold became three months behind on his loan payments in April 2009. (Decl. of Kyle Lucas, hereinafter "Lucas Decl.," ¶ 6). Mr. Gold requested and obtained a loan modification from his servicer, Saxon Mortgage Services, Inc. ("Saxon"). (DSMF ¶¶ 4, 5). Under the Modification Agreement, for five years, Mr. Gold's interest rate was reduced from 8.175% to 5% and his monthly principal and interest payment was reduced from $1,528.18 to $1,119.53. (30(b)(6 Dep. of Ocwen Loan Servicing, LLC (Kyle Lucas as Designee), hereinafter "Lucas Dep.," Ex. 4; DSMF ¶ 5).

## I.   <u>Ocwen Begins Servicing Mr. Gold's Loan</u>

On November 17, 2009, Ocwen acquired the servicing rights for Mr. Gold's loan. (DSMF ¶¶ 6, 7). Mr. Gold received a letter from Saxon dated October 30, 2009, explaining that effective November 16, 2009, the servicing for his loan would be transferred from Saxon to Ocwen. (Dep. of Pl. Michael Gold, hereinafter "Michael Gold Dep.," 141, Ex. 21). The letter also stated that if Mr. Gold wanted to send a qualified

---

(11th Cir. 1989). Thus, this Court will not consider any fact (1) not supported by citation to evidence (including a page or paragraph number); or (2) stated as an issue or legal conclusion.

written request ("QWR") regarding the servicing of his loan, the QWR "must be sent to: Ocwen Loan Servicing, LLC, Attention: Customer Service, P.O. Box 785057, Orlando, FL 32878-5057." (Michael Gold Dep., Ex. 21, p. 2).

In April 2010, Mr. Gold fell three months behind in his mortgage payments. (Lucas Decl. ¶ 10). Mr. Gold applied for a second loan modification to lower his payment so that he could afford to stay in his home. (DSMF ¶ 10). On May 5, 2010, Ocwen modified the terms of Mr. Gold's loan by (1) reducing the interest rate to 2.94274% for 3 years and to 5% for the remainder of the lifetime of the loan; and (2) further reducing Mr. Gold's monthly principal and interest payment to $933.47. (DSMF ¶ 11; Michael Gold Dep., Ex. 10). As with the Promissory Note, only Mr. Gold executed the loan modification. (Michael Gold Dep., Ex. 10). Mr. Gold made payments as required by the modification through July 2011. In August, however, Mr. Gold made not only his regularly scheduled payment on time, but also, he made an additional payment of $1,200.00. (DSMF ¶ 14).

## II.   Ocwen Reinstates the Saxon Loan Modification

On or about August 16, 2011, Ocwen, without explanation, reapplied the terms of Saxon's prior loan modification to Mr. Gold's loan. (DSMF ¶ 15; Lucas Dep. 42-44). Reapplying the terms of the Saxon's prior loan modification had the effect of lowering the principal balance on the loan, raising the interest rate on the loan to 5%, and setting the next payment due date to May 1, 2012, which was nine months into the future. (DSMF ¶ 16). On August 17, 2011, Ocwen generated a monthly statement on the loan

showing these changes and Mr. Gold received it shortly thereafter.  (DSMF ¶ 17).

Approximately two months later, in October 2011, Mr. Gold received an IRS Form

1099-C from Ocwen indicating $39,534.91 in cancelled debt on the loan. (DSMF ¶ 18).

The Golds knew the information on the August 2011 statement was mistaken and that

monthly payments continued to be due on the loan.  (DSMF ¶ 19).

Melody Gold testified that she and her husband attempted to make payments

every single month.  (Dep. of Pl. Melody Gold, hereinafter "Melody Gold Dep.," 82).

The payments submitted between November 2011 and April 2012 were not applied to

the loan.  (DSMF ¶ 25).  According to Mrs. Gold, when she and Mr. Gold attempted to

make payments by phone or the internet, they were blocked from making the payment.

(Melody Gold Dep. 82).  Mrs. Gold further testified that she called to talk to an Ocwen

representative who instructed her to mail a check.  (Melody Gold Dep. 82).  Mrs. Gold

stated sending the payments return receipt requested.  (Melody Gold Dep. 83).  Mrs.

Gold admits that payments for November 2011, January 2012, February 2012, and

March 2012 did not clear her bank.  (Melody Gold Dep. 84).

On or about September 1, 2011, Ocwen received a personal check from Michael

Gold in the amount of $1,271.67, which matched the amount shown by the August 2011

statement to be due on May 1, 2012.  (DSMF ¶ 21).  The payment was applied as a

principal reduction and to escrow because, under the prior Saxon loan modification, the

next payment was not due until May 2012.  (DSMF ¶ 21).  Ocwen received another

$1,271.67 payment by personal check which was also applied as a principal reduction

and to escrow on October 24, 2011.  (DSMF ¶ 22).  Ocwen also admits receiving 3

payments for May 2010 through July 2010 for $1,137.57 each, 10 payments made

between August 2010 and May 2011 for $1,137.57 each, two payments made between

June and August 2011 in the amount of $1,177.18 each, an additional payment of $1,200

in August 2011, as well as two payments in the amount of $1,271.67 in September and

October 2011.  (DSMF ¶ 28).

### III.  Plaintiffs Send Letters Questioning the August 2011 Changes to the Terms of the Loan

#### A.  First Letter

Ocwen received no written correspondence from Mr. or Mrs. Gold until February

17, 2012.  (DSMF ¶ 29).  Beginning on February 17, 2012, Ocwen received five pieces

of correspondence from the Golds and Mr. Gold's counsel which Mr. Gold contends are

QWRs.  (DSMF ¶ 30).  Plaintiffs state in their interrogatory responses that they sent

their QWRs to the following addresses: (1) P.O. Box 6640, Carol Stream, IL 60197; (2)

P.O. Box 24736, West Palm Beach, FL 33416-4736; (3) P.O. Box 24646, West Palm

Beach, FL 33416-4646; and (4) P.O. Box 24737, West Palm Beach, FL 33416-4737.

(Pl.'s Interrogatory Resp., pp. 8-9, Doc. 57-13, at 8-9).

On February 17, 2012, Ocwen received an undated letter from Mrs. Gold.  (DSMF

¶ 31).  Therein, Mrs. Gold complained that Ocwen "all of a sudden in August 2011"

showed the balance on the loan being reduced by $24,014.78 from $200,729.88 to

$176,715.00 and advised Ocwen that she and Mr. Gold did not owe a payment until May

2012.  (Lucas Dep., Ex. 5, Doc. 67-6, at 30).  Mrs. Gold further stated that she received a 1099-C from Ocwen indicating a cancellation of $39,534.91 in debt and that she cannot file her taxes because she would be expected to pay taxes on the cancelled debt. (Id.).  Mrs. Gold further stated that she had not authorized the cancellation of debt and that she had never missed a house payment.  (Id.).  Ocwen employees researched the errors outlined in Mrs. Gold's letter and reached the conclusion that in August 2011, Ocwen had incorrectly applied the terms of the prior Saxon loan modification as a new modification.  (DSMF ¶ 33).

On March 1, 2012, Ocwen removed the terms of the Saxon modification, reapplied the terms of the May 2010 Ocwen modification, and reapplied eighteen payments it had received from the Golds.  (Lucas Decl. ¶ 28; Ocwen Dep. 228-29). After the eighteen payments were applied, covering the period from May 2010 through October 2011, a $409.72 overage resulted which was placed in a suspense account instead of being applied to the principal of the loan.  (Lucas Decl. ¶ 30; Lucas Dep. 228-41).  Ocwen reset the next payment due date so that the next payment due date was no longer May 1, 2012.  (Lucas Decl. ¶ 29).  Based on Ocwen's application of the eighteen payments, the next payment due was December 1, 2011.  (Lucas Decl. ¶ 32).  Ocwen generated a monthly statement showing that the (1) interest rate had been readjusted to 2.94274%; (2) the current balance had been readjusted to $198,980.91; and (3) the next payment due date was December 1, 2011.  (Lucas Decl. ¶ 33).

On March 2, 2012, Ocwen sent Michael Gold a notice of default showing that the

loan was four months past due and that $4,118.73 was required to reinstate the loan. (Lucas Decl. ¶ 34, Ex. 6). The $4,118.73 figure was comprised of four months of principal, interest, and escrow payments of $1,137.57 each (covering December 1, 2011 through March 1, 2012) minus the $431.55 in the suspense account. (DSMF ¶ 40). As of March 2, 2012, Ocwen did not apply any late fees or other fees associated with foreclosure. (DSMF ¶ 41).

On March 6, 2012, Ocwen responded to Melody Gold's February 17, 2012 letter, indicating that Ocwen modified the Loan twice: once in May 2010, and then again on August 16, 2011, based on terms approved by the prior servicer. (DSMF ¶ 43; Lucas Dep., Ex. 5, at 134, Doc. 67-6, at 9). Ocwen further stated that it processed the necessary corrections to reflect Ocwen's May 2010 loan modification, that the loan payment was due for December 2011, and indicated that a corrected 1099-C form and payment reconciliation history would be sent to Melody Gold's attention. (DSMF ¶¶ 44, 46). A payment reconciliation history was also sent. (DSMF ¶ 45).

### B.   Second Letter

On or around March 19, 2012, Ocwen received another handwritten letter from Melody Gold. (DSMF ¶ 47; Lucas Dep., Ex. 5, at 160-68, Doc. 67-6, at 35). Therein, Mrs. Gold reiterated that (1) Ocwen sent a monthly statement showing a balance of $176,715.10, down from $200,729.88 and indicating that the Golds did not owe a payment until May 2012; (2) Ocwen wrote off $39,534.91 in debt without the Golds having authorized the cancellation in debt; (3) she received a letter dated March 6, 2012,

9

in which Ocwen states that it completed a loan modification on August 16, 2011, even though there was no modification at that time; and (4) she received copies of payments on her house with numerous reversals where Ocwen reversed its mistake. (DSMF ¶ 48). Plaintiff further demands that her mortgage be brought "current to where [the Golds] were in August when [Ocwen] messed up!" (DSMF ¶ 48). On March 27, 2012, Ocwen sent Mrs. Gold a letter acknowledging receipt of her March 19, 2012 letter. (DSMF ¶ 49).

On May 10, 2012, Ocwen responded to Mrs. Gold's March 19, 2012 letter. (DSMF ¶ 50; Lucas Dep., Ex. 6, Doc. 67-7, at 1). In Ocwen's May 10, 2012 response, Ocwen explained that pursuant to Mrs. Gold's request, Ocwen has made necessary corrections and updates to their records to reflect the loan with the terms of modification approved on May 5, 2010. (DSMF ¶ 51). Ocwen confirmed that as of May 10, 2012, the loan was due for the January 2012 payment and included an updated payment history. (DSMF ¶¶ 53, 54).

C.   **Third Letter**

On June 13, 2012, Ocwen received a third letter, this time from Mr. Gold's then-counsel, Dale Calomeni. (DSMF ¶ 55; Lucas Dep., Ex. 5, at 145, Doc. 67-6, at 20). Therein, Calomeni provided a list of information he was requesting on the Golds' behalf, including (1) the identity of the secured creditor; (2) the true owner of the debt; (3) a complete and itemized statement of the loan history from inception to the present; and (4) a complete list of advances and charges against the loan. (DSMF ¶ 56). On or

around June 16, 2012, Ocwen responded to the letter in writing and advised that it would be sending a detailed transaction history.  (DSMF ¶ 57).  A transaction history was sent that day.  (DSMF ¶ 59).

### D.    Fourth Letter

On or around July 4, 2012, Ocwen received another letter from Calomeni. (DSMF ¶ 60; Lucas Dep, Ex. 5, at 139, Doc. 67-6, at 80).  The letter was a duplicate of Calomeni's previous letter, but it also included a one-page letter from the Golds dated June 25, 2012, in which they granted Calomeni access to their records.  (DSMF ¶ 61). Ocwen responded to Calomeni's letter on or about July 10, 2012, and stated: "Ocwen's records indicate that your concern[s] have been addressed in our previous research letter dated June 13, 2012."  (DSMF ¶¶ 62-63).

### E.    Fifth Letter

Ocwen received a fifth letter from Calomeni on August 20, 2012.  (DSMF ¶ 64; Lucas Dep, Ex. 11, Doc. 67-12, at 1).  Therein, Calomeni states that the Golds have sought to "insure that they are not the victims of such predatory lending practices as have been prevalent in the mortgage industry to date" and are mostly concerned about the increase in the amount of monthly payments, the principal balance owed, escrow payments, and increases in the amounts applied and attributed towards interest on the account.  (DSMF ¶ 65).  Calomeni further indicated that the Golds were concerned about (1)  decreases in the proper amounts applied and attributed towards principal on the account;  (2)  any assessed, charged, and/or collected fees, expenses, and

miscellaneous charges that they are not legally obligated to pay; (3) their credit scores and their actual debt. (DSMF ¶ 65; Lucas Dep, Ex. 11, Doc. 67-12, at 1). Calomeni also indicated that the Golds were concerned about secondary sales and transfers of mortgage servicing rights, deceptive and fraudulent servicing practices to enhance balance sheets, deceptive accounting tricks and practices that could negatively affect the Gold's credit rating, mortgage account, the debt, or payments that the Golds may be paying incorrectly to parties that are not their secured creditor. (Lucas Dep, Ex. 11, Doc. 67-12, at 1).

On or around August 22, 2012, Ocwen responded to Calomeni's letter. (DSMF ¶ 66; Lucas Dep., Ex. 12, Doc. 67-13). Therein, Ocwen indicated that it was sending Mr. Gold a full payment reconciliation history and mailed the reconciliation history the same day. (Lucas Dep., Ex. 12; DSMF ¶ 68).

## IV. Complaint to the Georgia Governor's Office of Consumer Protection

In May 2012, Mrs. Gold sent a complaint about Ocwen to the Georgia Governor's Office of Consumer Protection ("GOCP"). (DSMF ¶ 69; Lucas Dep, Ex. 5, at 128, Doc. 67-6, at 3). The GOCP sent a letter to Ocwen, dated May 18, 2012, which notified Ocwen that Melody Gold was dissatisfied, enclosed Mrs. Gold's complaint letter, and requested that Ocwen respond to the GOCP with its position on the matter within ten days. (Lucas Dep., Ex. 5, at 128, Doc. 67-6, at 3). Mrs. Gold's letter again complained that (1) Ocwen did not follow the terms of the May 2010 modification agreement; (2) the monthly statement incorrectly showed that the loan's principal balance had been reduced by $24,014.78 and incorrectly indicated that the next payment due was in May

2012; (3) that the Golds received a 1099-C for cancelled debt in the amount of $39,534.91 even though Mrs. Gold did not authorize a cancellation of debt or a new loan modification and the amount did not reconcile with Ocwen's records; (4) Ocwen indicated that the Golds were in default; (5) Ocwen ruined the Gold's credit because it reported that they were 120 days behind on their payments; (6) Ocwen refused some of the Gold's payments, failed to apply some of their payments even though their checks cleared the bank, and incorrectly applied others; and (7) Ocwen will not return her phone calls.  (Lucas Dep., Ex. 5, at 129, Doc. 67-6, at 4).

Ocwen sent a letter to the GOCP acknowledging the GOCP's correspondence on May 30, 2012.  (DSMF ¶ 73).   On June 8, 2012, Ocwen representative Ivonne Humphreys sent the GOCP a letter and copied Mr. Gold explaining again that Ocwen mistakenly applied the terms of the Saxon loan modification and that the matter had been corrected on March 1, 2012.  (DSMF ¶ 74; Lucas Dep., Ex. 7, Doc. 67-8). Humphreys further explained that Ocwen had only received eighteen payments during the twenty-two month period between May 2010 and March 2012, that the loan reflected that the payment was due for the December 1, 2011 payment, that subsequent payments were received, but no payments were received from November 2011 through February 2012.  (DSMF ¶¶ 75, 76).   Humphreys encouraged Mr. Gold to compare Ocwen's payment history with his records and that if he believes there is a missing payment, provide Ocwen with "adequate proof" of payment, such as the front and back copy of a cancelled check or money order, etc.  (DSMF ¶ 75).  Ocwen does not have a record of

Mr. Gold or anyone acting on his behalf supplying Ocwen with any proof of payments believed to be missing.  (Lucas Decl. ¶ 46).  Plaintiffs state that they attempted to make payments during this period, but they were refused by Ocwen and provide check numbers for the payments which Ocwen failed to apply.  (Michael Gold's Interrogatory Resp. pp. 3-6, Doc. 57-12, at 4-7).

Ocwen admits receiving a loan payment from Michael Gold and applying it on April 10, 2012.  (DSMF ¶ 83).  The April payment was applied to the December 2011 payment.  (Lucas Decl. ¶ 51).  Ocwen maintains that Mr. Gold then owed for the January 2012 payment and remained four payments behind.  (Lucas Decl. ¶¶ 51-52).  Although Mr. Gold continued to make one contractual payment for each month, Ocwen maintains that Mr. Gold remained four payments or 120 days late on his loan.  (Lucas Decl. ¶ 53).  In February 2013, Mr. Gold made a $4,550.28 payment, which Ocwen maintains brought the loan current.  (Lucas Decl. ¶ 54; DSMF ¶ 89).  Ocwen states that because Mr. Gold has either been in default or active litigation with Ocwen since March 2012, Ocwen denied Mr. Gold "the privilege of making payment[s] by phone or online in accordance with Ocwen's policies."  (Lucas Decl. ¶ 55).

## V.    Mr. Gold Disputes Information Ocwen Furnished to Credit Reporting Agencies

### A.    Equifax

In August 2013, Mr. Gold submitted a dispute form to Equifax Information Services, LLC ("Equifax") indicating that he and his wife had never been 120 days late

14

on their payments, they were current on their payments, and have been current with Ocwen Loan Servicing.  (DSMF ¶ 91; Doc. 57-15, at 13).  On or around August 13, 2013, Equifax notified Ocwen via e-Oscar, of Mr. Gold's dispute.  (DSMF ¶ 93).  Equifax transmitted the following text as "dispute reason": "Disputes current/previous account status/payment history profile/payment rating.  Verify payment history profile, account status, and payment rate."  (DSMF ¶ 93).

### B.   Experian

In August 2013, Mr. Gold also lodged a credit dispute with Experian Information Solutions, Inc. ("Experian").  (DSMF ¶ 97).  Again, Michael Gold reported to Experian, "[W]e are not and never have been 120 days late!!"  (Experian Aff. ¶ 7, Doc. 57-16, at 3).  Mr. Gold further stated, "We are current and have been current with Ocwen Loan Servicing[.] Please remove this – It is <u>not</u> correct!"  (Experian Aff. ¶ 7).  Mr. Gold's statements in this regard were the sole evidence of the dispute presented to Experian.  (DSMF ¶ 98).  On or around August 20, 2013, Experian notified Ocwen of the August 2013 dispute via e-Oscar and transmitted the following text as the "dispute reason": "106 - Disputes present/previous Account Status, History, Verify accordingly."  (DSMF ¶ 99).

### C.   Trans Union

In September 2013, Mr. Gold lodged a credit dispute with Trans Union, LLC ("Trans Union") by submitting a dispute form identifying his Ocwen loan number and indicating that "[W]e are not and never have been 120 days late!  We are current and

have been current with Ocwen Loan Servicing.  Please remove this!  It is not correct!" (DSMF ¶ 103; Trans Union Aff. ¶¶ 4-6).  On or around September 17, 2013, Trans Union notified Ocwen of Mr. Gold's dispute via e-Oscar and transmitted the following text as the "customer dispute": "Disp Cur Bal-Verify Orig Loan Amt, Schld Montly Pymt Amt, Actl Pymt Amt, Amt Past due, Curr Bal, and Orig Chrgoff Amt[.]" (DSMF ¶ 105).  Trans Union also indicated that Mr. Gold "Disputes Present/Prev Acct Status, Pymt Hist Profile, Pymt Rating.  Verify Pymt Hist Profile, Acct Status and Rating." (DSMF ¶ 105).  Ocwen also included a "TIFF image" of Mr. Gold's dispute.  (DSMF ¶ 106).

Upon notification of Mr. Gold's disputes submitted to Equifax, Experian, and Trans Union, Ocwen conducted an investigation based upon the information it received from them by reviewing the dispute codes they submitted, reviewing additional documentation they provided, comparing such documentation to the transaction history, and reporting its findings to them.  (DSMF ¶¶ 94, 100, 107).  After concluding the investigations, Ocwen reported to Equifax, Experian, and Trans Union that the 120 days late designation should appear for the months of May 2012 through September 2012 only.  (DSMF ¶¶ 95, 101-02, 108; Lucas Decl. ¶ 59).  Ocwen requested that Equifax, Experian, and Trans Union remove the late designation for October 2012 through January 2013 period because the loan was involved in active litigation during the period even though it understood Mr. Gold to be 120 days past due during that period.  (Lucas Decl. ¶¶ 59; DSMF ¶¶ 101-02, 109).

## II.   LEGAL ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for the motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Apcoa, Inc. v. Fid. Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required, however, to negate his opponent's claim; the movant may discharge his burden by merely "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like.  Id. at 324 (quoting Fed. R. Civ. P. 56(c)(1)).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is

AO 72A
(Rev.8/82)

material when it is identified as such by the controlling substantive law.  Id. at 248.

Moreover, the non-movant "must do more than simply show that there is some

metaphysical doubt as to the material facts . . . . Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-

87 (1986) (citations omitted).  An issue is not genuine if it is unsupported by evidence,

or if it is created by evidence that is "merely colorable" or is "not significantly

probative."  Anderson, 477 U.S. at 249-50.

### B.    Plaintiffs' RESPA Claims

Plaintiffs contend that Ocwen violated RESPA when it "failed to respond to

Plaintiffs' numerous [QWRs] in a timely manner in accordance with 12 U.S.C. §

2605(e)."  (Am. Compl. ¶¶ 59-61).  Ocwen contends that Plaintiffs' RESPA claims fail

because (1) Ocwen complied with RESPA when it responded to each of Plaintiffs'

letters in a timely manner, provided requested information, and corrected the errors

raised in Plaintiffs' letters or explained why it believed the account was correct; (2) Mrs.

Gold could not bring a RESPA claim because she was not a borrower on the loan; (3)

some of the letters Plaintiffs sent did not qualify as a QWR because they were not

mailed to the servicer's designated address and they did not relate to the servicing of the

loan; and (4) Plaintiffs cannot establish that their emotional distress or pecuniary

damages were caused by any RESPA violations.

RESPA was enacted to "insure that consumers throughout the Nation are provided

with greater and more timely information on the nature and costs of the settlement process" and "from unnecessarily high settlement charges caused by certain abusive practices that have developed . . . ." 12 U.S.C. § 2601(a).  RESPA is as a remedial consumer-protection statute and has been construed liberally to best serve Congress' intent. McLean v. GMAC Mortg. Corp., 398 F. App'x 467, 471 (11th Cir. 2010); Hardy v. Regions Mortg., Inc., 449 F.3d 1357, 1359 (11th Cir. 2006); Rawlings v. Dovenmuehle Mortg., Inc., 64 F. Supp. 2d 1156, 1165 (M.D. Ala. June 23, 1999) (citing Ellis v. Gen. Motors Acceptance Corp., 160 F.3d 703, 707 (11th Cir. 1998)).

RESPA imposes certain duties on loan servicers to respond to a borrower's QWR. Section 2605(e)(2) requires that the servicer acknowledge in writing the receipt of the QWR within twenty (20) days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested by the borrower is taken within such period.  12 U.S.C. § 2605(e)(1) (2012).  Additionally, the servicer must take action with respect to the QWR no "later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any [QWR]."  12 U.S.C. § 2605(e) (2012).  The servicer may take action by (1) making appropriate corrections in the account of the borrower and transmitting written notification of the correction to the borrower; (2) conducting an investigation and explaining in writing the reasons for which the servicer believes the account of the borrower is correct and providing the name of an employee who can provide assistance to the borrower; or (3) conducting an investigation and explaining in writing why the information requested by the borrower is unavailable or

AO 72A
(Rev.8/82)

cannot be obtained by the servicer.  12 U.S.C. § 2605(e)(2) (2012).

Here, Ocwen correctly argues that it timely responded to each of Plaintiffs' QWRs.  Ocwen received Mrs. Gold's first letter on February 17, 2012.  (DSMF ¶ 31). By March 1, 2012, Ocwen made corrections to Mr. Gold's account, and by March 6, 2012, Ocwen not only acknowledged receipt of Mrs. Gold's communication regarding the loan, it also sent a written response to Mrs. Gold's inquiry explaining the errors in the processing of the account as well as the corrections that were made.  (DSMF ¶¶ 43-46; Lucas Dep., Ex. 5, at 134, Doc. 67-6, at 9).  A payment reconciliation history was also sent on March 6, 2012.  (DSMF ¶ 45).

Ocwen timely acknowledged the second letter it received (received March 19, 2012) within twenty days on March 27, 2012.  (DSMF ¶ 47, 49; Ex. 5, at 160, Doc. 67-6, at 35).  Ocwen also timely responded within sixty days on May 10, 2012.  (DSMF ¶ 50; Lucas Dep., Ex. 6, Doc. 67-7, at 1;).  Ocwen explained therein its actions with respect to the loan modifications and the corrections that it had made to the account. (Lucas Dep., Ex. 6, Doc. 67-7, at 1).

Ocwen received the third letter on June 13, 2012.  (DSMF ¶ 55; Lucas Dep., Ex. 5, at 145, Doc. 67-6, at 20).  Ocwen timely acknowledged the letter and responded to it on June 16, 2012.  (Lucas Dep., Ex. 8, Doc. 67-9, at 8).  Therein, Ocwen explained when it acquired the servicing rights from Saxon, that it would be providing Mr. Gold with a detailed transaction history and an escrow analysis statement for the loan, indicated that Mr. Gold was being assessed fees that Ocwen incurred as a result of Mr.

Gold's payment delinquency, explained that there was no single investor for Mr. Gold's loan because it was securitized, and that Ocwen did not have a duty under Section 2605(e) of RESPA to respond to questions which did not relate to the servicing of the loan.  (Id.).

Ocwen received a fourth letter from Mr. Gold's counsel on July 4, 2012, which was a duplicate of the third letter.  (DSMF ¶ 60; Lucas Dep, Ex. 5, at 139, Doc. 67-6, at 14).  Ocwen timely complied with the acknowledgment and response deadlines set by RESPA when it responded on July 10, 2012.  (DSMF ¶¶ 62-63; Lucas Dep., Ex. 9, Doc. 67-10).  Likewise, Ocwen timely acknowledged and responded to the fifth letter (received on August 20, 2012) when it responded two days later on August 22, 2012.  (DSMF ¶ 66; Lucas Dep., Ex. 11, Doc. 67-12, at 1, Ex. 12, Doc. 67-13).  Ocwen also timely acknowledged to the GOCP's letter (dated May 18, 2012) within 20 days on May 30, 2012, and timely responded within sixty days on June 8.  (Lucas Dep., Ex. 5, at 128, Doc. 67-6, at 3, Ex. 7, Doc. 67-8; DSMF ¶¶ 73-74).

In Plaintiffs' Response, they do not dispute that Ocwen timely acknowledged their letters or that Ocwen's responses to their requests for information, each occurring within sixty days of their letters, were untimely or insufficient.  Instead, Plaintiffs recharacterize their RESPA claims as being based on the notion that Ocwen did not properly correct their loan account in response to the QWRs.  (Pl.'s Br. 9).  Plaintiffs now contend that Ocwen violated RESPA because after it reapplied the payment terms from the May 2010 Ocwen modification, it misapplied their payments in a manner

inconsistent with the way in which Plaintiffs actually made the payments and failed to send them monthly statements.  Plaintiffs' Amended Complaint does not provide notice to Ocwen that this is the substance of their RESPA claim and instead, focuses on the timeliness of Ocwen's responses to their letters or Ocwen's failure to respond outright. (Am. Compl. ¶¶ 15, 18, 20, 32, 59-61).  Plaintiffs also appear to argue that Ocwen's failure to provide them with regular statements also violated the Truth in Lending Act, 15 U.S.C. § 1638(f) ("TILA").  Plaintiffs cannot amend their Complaint to include new RESPA and TILA claims via their response to Ocwen's summary judgment motion; Plaintiffs must move to amend their Complaint in order to assert new claims.  Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (explaining that the plaintiff could not amend her complaint through her argument in a brief opposing summary judgment and that the proper procedure for asserting a new claim was to seek to amend the complaint).

Even if Plaintiffs' Amended Complaint is construed to present a claim that Ocwen violated RESPA by misapplying Mr. Gold's payments, providing inaccurate information, or failing to send monthly statements, however, Plaintiffs' claim would fail. A servicer does not incur liability under RESPA merely because it has incorrectly applied payments or fails in some duty required under the Note and the Security Deed. RESPA requires the servicer to *either* 1) make appropriate corrections to the account and provide written notice of the corrections to the borrower; (2) conduct an investigation and explaining in writing the reasons for which the servicer believes the

22

account of the borrower is correct and providing the name of an employee who can provide assistance to the borrower; or (3) conduct an investigation and explain in writing why the information requested by the borrower is unavailable or cannot be obtained.  12 U.S.C. § 2605(e)(2) (2012); Russell v. Nationstar Mortg., LLC, No. 14-61977-CIV-BLOOM/VALLE, 2015 WL 5029346, at *4 (S.D. Fla. Aug. 26, 2015) (explaining that the servicer only has to comply with one of the options in Section 2605(e)(2) to comply with RESPA); Beale v. Ocwen Loan Serv., No. 7:15-CV000397-LSC, 2015 WL 3767246, at *5 (N.D. Ala. June 17, 2015) (rejecting RESPA claim that servicer did not conduct an adequate investigation, correct errors or provide a meaningful explanation as to why no correction was needed because servicer provided a statement about why it believed the action taken or not taken regarding her account was correct).   The end goal of RESPA is transparency and the facilitation of communication between borrowers and servicers.  Bates v. JPMorgan Chase Bank, NA, 768 F.3d 1126, 1135 (11th Cir. 2014).  Thus, even if the borrower disagrees with the manner in which his account is corrected or the accuracy of the servicer's response to the borrower's QWR, the servicer still fulfills its duty when it provides an explanation as to why it believes the borrower's account is correct and provides the borrower with contact information for further assistance.  Bates, 768 F.3d at 1134 (finding that servicer complied with RESPA because it provided the borrower with reasons it believed the account was correct even though borrower was confused or dissatisfied with answer); Chipka v. Bank of Am., 355 F. App'x 380, 381 (11th Cir. 2009); Beale, 2015 WL

23

3767246, at *5-6 (rejecting claim that servicer did not conduct an adequate investigation, correct errors or provide a meaningful explanation as to why no correction was needed because it provided a statement about why it believed the action taken or not taken regarding her account was correct); Whittaker v. Wells Fargo Bank, NA, No. 6:12-CV-98-ORL-28GJK, 2014 WL 5426497, at *8 (M.D. Fla. Oct. 23, 2014) (rejecting borrower's challenge as to sufficiency of response because RESPA "does not require the servicer to provide the resolution or explanation desired by the borrower, it requires the servicer to provide a statement of its reasons" and borrower's arguments were directed at whether servicer's action was appropriate under the terms of the mortgage); see also Brunson v. Provident Funding Assoc., 608 F. App'x 602, 611-12 (10th Cir. 2015) (explaining that "RESPA does not require the servicer to provide information the borrower believes to be accurate.  It requires the servicer to provide a statement of the reasons *for which the servicer believes* the account of the borrower is correct *as determined by the servicer* and the information requested by the borrower").  Here, Plaintiffs do not demonstrate that Ocwen did not correct Mr. Gold's account in good faith or that Ocwen did not provide a good faith explanation of the reasons it believed that the account of the borrower was correct.  Claims that Ocwen misapplied their payments, provided inaccurate information, and failed to send Plaintiffs monthly statements are outside the scope of RESPA.  Accordingly, summary judgment should be **GRANTED** as to Plaintiffs' RESPA claims.

AO 72A
(Rev.8/82)

### C.   **Plaintiff Michael Gold's FCRA Claims**

Plaintiff Michael Gold contends that Ocwen wilfully and negligently violated Section 1681s-2(b) of the FCRA of when it failed to report his account as disputed and furnished false credit information to Equifax, Experian, and Trans Union without conducting a reasonable investigation into his dispute.  Ocwen contends that Mr. Gold's FCRA claims fail because (1) it correctly reported him delinquent for 120 days; (2) its investigations were reasonable in light of the scant information about the nature of Mr. Gold's dispute; and (3) it was not required to designate Mr. Gold's loan account as disputed because Mr. Gold did not provide a bona fide, meritorious argument regarding his liability on the underlying debt.

Mr. Gold responds only that Ocwen did not correctly report him as delinquent because he sent all of the payments that were due pursuant to the May 2010 loan modification.  Mr. Gold does not respond to Ocwen's remaining arguments that its investigation was reasonable in light of the scant information about the nature of Mr. Gold's dispute and it was not required to designate the account as disputed because Mr. Gold did not provide a bona fide meritorious argument regarding his liability on the underlying debt.

Mr. Gold appears to bring his FCRA claim pursuant to 15 U.S.C. § 1681s-2(b).[3]

---

[3]   Although § 1681s-2(a) of the FCRA prohibits any person from furnishing information to a CRA that the person knows is inaccurate, the statute explicitly bars private suits for violations of this section. 15 U.S.C. §§ 1681s-2(a)(1), 1681s-2(c), 1681s-2(d), 1681s; Nawab v. Unifund CCR Partners, 553 F. App'x 856, 860 (11th Cir. 2013); Steed v. Everhome Mortg. Co., 308 F. App'x 364, 369-70 (11th Cir. 2009).

Under Section 1681s-2(b), the FCRA requires furnishers of credit information to investigate the accuracy of said information upon receiving notice of a dispute from a consumer reporting agency.  15 U.S.C. § 1681s-2(b).  A private right of action against a furnisher only arises under Section 1681s-2(b) after the furnisher has received notice of a dispute regarding the allegedly inaccurate information from a consumer reporting agency.  Anderson v. EMC Mortg. Corp., 631 F.3d 905, 907 (8th Cir. 2011) (holding that the duties of a furnisher of credit information under 15 U.S.C. § 1681s-2(b) are triggered by notice that its information is being disputed from a CRA, not from the consumer); Peart, 345 F. App'x at 386 (holding that § 1681s-2(b) "can be enforced through a private right of action, but only if the furnisher received notice of the consumer's dispute from a consumer reporting agency."); Green v. RBS Nat'l Bank, 288 F. App'x 641, 642-43 (11th Cir. 2008), cert den'd, 129 S. Ct. 929 (2009). When a consumer reporting agency notifies a furnisher of a dispute with regard to an account, the furnisher of information must: (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided to it by the consumer reporting agency; (3) report the results of the investigation to the agency; and (4) if the investigation reveals that any information is inaccurate or incomplete, report the results to all consumer reporting agencies to which it originally provided the erroneous information. 15 U.S.C. § 1681s-2(b); Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005); Granville Alley v. The Farmers Bank, No. 3:13-CV-146 (CAR), 2014 WL 4287103, at *3 (M.D. Ga. Aug. 29, 2014).  A consumer has a private right of

26

action against a furnisher of information for a violation of Section 1681s-2(b) if the furnisher, after receiving notice of the consumer's dispute from a credit reporting agency, fails to conduct a reasonable investigation with respect to the disputed information. 15 U.S.C. § 1681s-2(b); Peart v. Shippie, 345 F. App'x 384, 386 (11th Cir. 2009); Hinkle v. Midland Credit Mgmt., No. CV 313-033, 2015 WL 74267, at *8 (S.D. Ga. Jan. 6, 2015).

Thus, the pertinent question is whether a furnisher's investigation procedures were reasonable in light of what the credit reporting agencies told it about the nature of the dispute. Chiang v. Verizon New England Inc., 595 F.3d 26, 38 (1st Cir. 2010); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1155 (9th Cir. 2009); Alston v. United Collections Bureau, No. DKC-0913, 2014 WL 859013, at *7 (D. Md. Mar. 4, 2014). What is a reasonable investigation by a furnisher may vary depending on the circumstances. Chiang, 595 F.3d at 40; Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 430-31 (4th Cir. 2004). For instance, a more limited investigation may be appropriate where the consumer reporting agencies provide the furnisher with vague or cursory information about a consumer's dispute. Seamans v. Temple Univ., 744 F.3d 853, 866 (3d Cir. 2014) (finding that where consumer reporting agency provided considerable information about the nature of the dispute and furnisher allotted only a minimal amount of time to investigate each claim, investigation procedures were not reasonable); Edeh v. Midland Credit Mgmt., 413 F. App'x 925, 926 (8th Cir. 2011) (finding that where credit reporting agencies provided little detail as to the basis for

27

dispute, it was reasonable for furnisher to check the information it received from seller of the debt to verify the debt); <u>Chiang</u>, 595 F.3d at 38 (alluding to the notion that merely confirming with the creditor that the information submitted is accurate may not be sufficient if the circumstances indicate that a more searching inquiry may have been necessary); <u>Westra</u>, 409 F.3d at 827 (finding that collector's investigation into consumer's allegations of fraud, which consisted of verifying name, address, and date of birth of account holder, was reasonable because collector received scant information regarding the nature of the dispute).

In this case, Mr. Gold does not argue Ocwen's investigation was unreasonable in light of what Ocwen was told about the nature of the dispute. Instead, Mr. Gold focuses on his belief that the information Ocwen submitted to the credit reporting agencies was inaccurate. Investigations are not necessarily unreasonable just because the investigation results in a substantive conclusion unfavorable to the consumer which turns out to be inaccurate. <u>Chiang</u>, 595 F.3d at 40 (explaining that borrower was required to present evidence of actual inaccuracies in his account that an alternative investigation might have uncovered); <u>Gorman</u>, 584 F.3d at 1161; <u>Arianas v. LVNV Funding, LLC</u>, No. 8:14-CV-1531-T-27EAJ, 2015 WL 5038269, at *3 (M.D. Fla. Aug. 25, 2015); <u>cf. Cahlin v. Gen. Motors Acceptance Corp.</u>, 936 F.2d 1151, 1156 (11th Cir. 1991) (explaining that the FCRA does not make credit reporting agencies strictly liable for all inaccuracies and that if the investigation followed reasonable procedures, even if the report was inaccurate, a credit reporting agency can escape liability under the

FCRA).  Mr. Gold's burden on summary judgment, therefore, was to point to evidence that raises a genuine issue of material fact as to whether Ocwen's investigation procedures were reasonable in light of what the credit reporting agencies told it about the nature of the dispute.  Here, Mr. Gold does not present any such evidence.  Indeed, Mr. Gold does not point to any evidence regarding the nature of Ocwen's investigation.  Additionally, Mr. Gold does not point to any documentation or evidence he submitted to Ocwen at the time of the dispute or even prior to his dispute showing that he made all of his payments other than his unadorned statements that he had done so.  Arianas, 2015 WL 5038269, at *3 (explaining that borrower's unsupported assertion that he paid off his debts does not undermine the reasonableness of furnisher's investigation).  Thus, unfortunately, Mr. Gold fails to raise any genuine issue of material fact as to whether the investigation was unreasonable.  Because Mr. Gold fails to raise a genuine issue of material fact as to whether Ocwen's investigation was unreasonable, Mr. Gold also fails to raise a genuine issue of material fact as to whether Ocwen's duty to report corrections for any previously supplied information which was inaccurate or incomplete was triggered under the FCRA. 15 U.S.C. § 1681s-2(b); Chiang, 595 F.3d at 40; Westra, 409 F.3d at 827; Granville Alley, 2014 WL 4287103, at *3; cf. Cahlin, 936 F.2d at 1156.

Additionally, Mr. Gold does not present any argument as to why Ocwen's investigation was deficient or identify reasonable investigative steps Ocwen should have taken, based on the information it received about the dispute from the credit reporting agencies, that it did not.  Mr. Gold does not present any legal authority tending to show

why the investigation undertaken by Ocwen in this case was unreasonable.  Instead, Mr. Gold's failure to respond to Ocwen's arguments equates to an abandonment of his claim pursuant to Section 1681s-2(b).  The law is well settled in this circuit that a legal claim or argument that has not been briefed is deemed abandoned.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681-82 (11th Cir. 2014) (explaining that appellant abandoned a claim when he did not address holdings of district court other than to make passing references to the holdings without advancing any arguments or citing any authorities to establish they were in error); Clark v. City of Atlanta, 544 F. App'x 848, 854-55 (11th Cir. 2013) (agreeing with the district court's determination that plaintiffs' failure to respond to defendants' summary judgment arguments with respect to excessive force and state law claims meant that the plaintiffs abandoned their claims); Seay v. United States, 166 F. App'x 422 (11th Cir. 2006) (holding that petitioner's mere statement that the district court improperly dismissed his complaint on res judicata grounds without any substantive argument in support amounted to abandonment of his claims even though he argued the merits of his underlying claims); Brooks v. Branch Banking and Trust Co., No. 1:15-CV-00186-SCJ, 2015 WL 3478169, at *4 (N.D. Ga. May 28, 2015) (explaining that plaintiff abandoned her claim when she failed to address defendant's argument for its dismissal); Bute v. Schuller Int'l Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding plaintiff abandoned a claim for retaliation under the ADA by failing to respond to defendant's argument on summary judgment that plaintiff failed to exhaust administrative remedies).  Accordingly, summary judgment should be

**GRANTED** as to Mr. Gold's claim that Ocwen violated Section 1681s-2(b) of the FCRA of when it furnished false credit information to Equifax, Experian, and Trans Union without conducting a reasonable investigation into his dispute.

Likewise, Mr. Gold fails to raise a genuine issue of material fact as to whether Ocwen was obligated under Section 1681s-2(b) to designate his loan as disputed. Ocwen argues Mr. Gold's claim fails because when he disputed the debt to credit reporting agencies, he did not make a bona fide, meritorious argument regarding his liability on the underlying debt; therefore, Ocwen's duty to report his debt was never triggered. In support, Ocwen points out that Mr. Gold's dispute did not contain any argument as to his liability for the four missing payments and only communicated his belief, unsupported by documentation or reasoning, that Ocwen inaccurately reported his loan as 120 days past due. Thus, Mr. Gold failed to provide sufficient information to investigate the disputed information.

In response, Mr. Gold does not respond to Ocwen's argument that his manner of reporting the dispute did not trigger its duty to report the debt as disputed. Mr. Gold's general response was only that his account was not 120 days past due because he sent all of his payments that were due, whether or not Ocwen accepted them. Mr. Gold's failure to address Ocwen's actual summary judgment argument amounts to an abandonment of his claim. Sapuppo, 739 F.3d at 681-82 (11th Cir. 2014); Clark, 544 F. App'x at 854-55; Seay, 166 F. App'x at 422; Brooks, 2015 WL 3478169, at *4; Bute, 998 F. Supp. at 1477. Accordingly, summary judgment should be **GRANTED** as to Mr.

AO 72A
(Rev.8/82)

Gold's claim that Ocwen violated Section 1681s-2(b) when it failed to designate his loan as disputed.[4]

### D.   Breach of Contract and Appointment of an Auditor

Plaintiffs further claim that Ocwen breached their Modification Agreement of the loan because Ocwen refused to accept Plaintiffs' mortgage payments via phone or U.S. mail, prevented them from accessing their account on the internet, and forced them to mail their payments at least thirty days in advance of the due date via certified mail. (Am. Compl. ¶ 66).   Ocwen argues summary judgment should be granted as to Mrs. Gold's breach of contract claim because she was not a party to the Note and therefore, did not have standing to complain of its breach.   Plaintiffs do not directly respond to Ocwen's argument that Mrs. Gold does not have standing to bring a breach of contract claim.   Thus, Mrs. Gold's breach of contract claim has been abandoned.   Sapuppo, 739 F.3d at 681-82 (11th Cir. 2014); Clark, 544 F. App'x at 854-55; Seay, 166 F. App'x at 422; Brooks, 2015 WL 3478169, at *4; Bute, 998 F. Supp. at 1477.

Moreover, this Court agrees with Ocwen that Mrs. Gold does not have standing to complain of a breach of the Modification Agreement or the original Note.   In order

---

[4] In this case, it would be especially inappropriate for this Court to analyze Mr. Gold's claim as the Eleventh Circuit has not yet recognized a claim for violation of Section 1681s-2(b) when a furnisher has failed to designate the borrower's debt as disputed.   Because the Eleventh Circuit has not yet recognized the claim, there is no binding precedent for how such claims are evaluated.   Additionally, because Mr. Gold has not responded to Ocwen's arguments, Mr. Gold has not provided any authority as to the standard for evaluation of such claims or analysis of how that standard for evaluation applies to the facts of his case.   Mr. Gold simply has provided no guidance for how to analyze his claim.

to establish that she has standing, a plaintiff must show that: (1) she has suffered an injury in fact; (2) there is a causal connection between the injury and the defendant's conduct; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1273-74 (11th Cir. 2001). It is Mrs. Gold's burden to demonstrate that she has standing to bring a complaint. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). In this case, Mrs. Gold fails to establish Article III standing because she cannot show that Ocwen's processing of loan payments on Mr. Gold's loan caused her an injury in fact. It is undisputed that Mrs. Gold was not obligated to repay the loan under the terms of the Promissory Note or the Modification Agreement. (DSMF ¶¶ 2, 11; Michael Gold Dep., Ex. 10). Although Mr. Gold may have suffered injuries from Ocwen's alleged failure to accept his payments and properly process them, Mrs. Gold did not because she was not obligated to repay the loan. Henry v. Guaranteed Rates, Inc., 415 F. App'x 985, 985-86 (11th Cir. 2011) (plaintiff, who acquired interest in property by quitclaim deed, but was not party to mortgage loan, lacked standing to complain about any alleged misconduct regarding mortgage loan); Johnson v. Ocwen Loan Serv., 374 F. App'x 868, 873 (11th Cir. 2010) (explaining that daughter did not have standing to complain about Ocwen's failure to post loan payments and other actions taken with respect to loan even though mother had quit claimed property to daughter and her sister because daughter had no legal obligation on the loan). Plaintiffs argue in connection with their RESPA claim that they had standing to challenge Ocwen's actions under

33

RESPA because Mrs. Gold signed the Security Deed and the Security Deed identifies Mrs. Gold as a borrower.  Plaintiffs' Security Deed, however, does not obligate Mrs. Gold to repay the loan.  The Security Deed clearly specifies that "any Borrower who co-signs this Security Instrument, but does not execute the Note . . . is not personally obligated to pay the sums secured by the Security Instrument."  (Doc. 67-3, at 9).  Thus, Mrs. Gold is not personally harmed by misapplication of payments and does not have standing to challenge the breach of contract of which she is not a party.  Henry, 415 F. App'x at 985-86; Johnson, 374 F. App'x at 873; see also Sterling Fin. Servs. v. Franklin, 259 F. App'x 367, 369 (2d Cir. 2008) (explaining that guarantor lacked standing to assert that lender breached duty under loan agreements of which he was not a party because breach had nothing to do with guarantor agreement guarantor had signed); Pierce v. Green Tree Serv., No. 15-CV-913-RBJ, 2015 WL 6689487, at *2 (D. Colo. Nov. 3, 2015) (mere ownership in property which was security for loan did not give standing to challenge alleged misconduct regarding the loan).  Accordingly, summary judgment should be **GRANTED** as to Mrs. Gold's breach of contract claim.

Ocwen also argues perfunctorily that "Borrower has not provided evidence to support any of [the] elements [of his breach of contract claim]" and that "Borrower has failed to present evidence to demonstrate that an auditor should be appointed under Georgia law."  (Def.'s Br. 24).  Ocwen's arguments in this regard, however, are too underdeveloped for the Court to evaluate them or for Plaintiffs to be expected to properly respond to them.  Ocwen does not explain the specific bases for its general

34

arguments and does not develop them with any facts or reasoning.   Ocwen's underdeveloped, skeletal arguments are simply insufficient to support entry of summary judgment.   Hardy v. Jim Walter Homes, Inc., No. 06-0687-WS-B, 2008 WL 906455, at *13 (S.D. Ala. Apr. 1, 2008).   This Court is not under an obligation to distill and develop Ocwen's summary judgment arguments and declines to do so.   United States Steel Corp. v. Astrue, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (declining to address argument because it was perfunctory and underdeveloped and not supported by citation to authority); Flanigan's Enters., Inc. v. Fulton Cty., 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument), superceded by statute on other grounds, 596 F.3d 1265 (11th Cir. 2010); Resolution Trust Corp. v. Dunmar, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it."). Accordingly, summary judgment should be **DENIED** as to Plaintiff Michael Gold's breach of contract claim and Plaintiffs' claims that an auditor should be appointed to prepare an accounting.

## CONCLUSION

Based on the foregoing reasons, Ocwen's Motion for Summary Judgment should be **GRANTED IN PART AND DENIED IN PART**.   (Doc. 57).   As this is a final Report and Recommendation and there are no other matters pending before this Court,

the Clerk is directed to terminate the reference to the undersigned.[5]

   **SO REPORTED AND RECOMMENDED** this   17   day of February, 2016.


/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

---

   [5]  No other issues remain before the Court.  Although the deadline for filing summary judgment has passed, Equifax Information Services, LLC has neither moved for summary judgment nor to do so out of time.

AO 72A
(Rev.8/82)